# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ROBERT D. LEE-KENDRICK,

    **Petitioner,**

    **v.**                                         **Case No. 15-CV-1117**

SCOTT ECKSTEIN,

    **Respondent.**

## DECISION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

    Robert D. Lee-Kendrick, a prisoner in Wisconsin custody, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Lee-Kendrick was convicted of two counts of repeated sexual assault of a child and one count of second-degree sexual assault of a child. (Habeas Petition at 1, Docket # 1.) He was sentenced to seventy-five years, consisting of forty-five years of initial confinement followed by thirty years of extended supervision. (*Id.*) Lee-Kendrick alleges that his conviction and sentence are unconstitutional. For the reasons stated below, the petition for writ of habeas corpus will be denied and the case dismissed.

## BACKGROUND

    Lee-Kendrick was charged in December 2007 with multiple sexual assaults of three girls under the age of sixteen—T.K. (Lee-Kendrick's biological daughter), A.W. (the daughter of Lee-Kendrick's girlfriend), and K.D. (a friend of A.W.). (*State v. Lee-Kendrick*, Appeal No. 2014AP1168 (Wis. Ct. App. Apr. 14, 2015), Answer to Habeas Petition ("Answer"), Ex. 10, Docket # 31-10.) Lee-Kendrick initially pled no-contest to three felonies but was later allowed to withdraw his pleas based on ineffective assistance of trial

counsel concerning whether Lee-Kendrick could appeal a specific trial court ruling. (*Id.* at 2.)

The case proceeded to trial in June 2011. All three girls testified at trial. A.W. testified that she had known Lee-Kendrick since she was five years old because he used to "go with [her] mom" and Lee-Kendrick and her mother had two children together. (Transcript of June 1, 2011 P.M. Jury Trial at 6–7, Answer, Ex. 36, Docket # 31-36.) A.W. testified that Lee-Kendrick sexually assaulted her for the first time when she was twelve years old at the home she shared with her mother, grandmother, and Lee-Kendrick. (*Id.* at 19–20.) Although she could not remember exactly how many times Lee-Kendrick assaulted her after that, A.W. testified that it was more than three times. (*Id.* at 24.) A.W. testified that Lee-Kendrick "made [her] have sex with him," which she described as both "penis-to-vagina" and "penis-to-mouth" contact. (*Id.* at 23.) She also stated that Lee-Kendrick forced A.W. and T.K. to perform sex acts on each other while he took video recordings. (*Id.* at 35.) A.W. testified that Lee-Kendrick told her she owed him because he bought her a phone and gave her money. (*Id.* at 23.) A.W. testified that she told her mother's best friend, Sheba Lopez, about the abuse in November 2007 because she was tired of experiencing it. (*Id.* at 26–27.) Lopez called the police. (*Id.* at 11.)

K.D. testified that she knew A.W. from school and that A.W. was one of her best friends. (*Id.* at 74.) K.D. testified that Lee-Kendrick owned a mansion in River Hills and K.D. was spending the night with A.W. and other friends celebrating A.W.'s birthday in January. (*Id.* at 75–78.) Although she could not remember the exact year, she thought they

2

were celebrating A.W.'s sixteenth birthday. (*Id.*) K.D. had not met Lee-Kendrick prior to this night. (*Id.* at 78.) K.D., who was fourteen years old at the time, testified that Lee-Kendrick gave the kids alcohol during the party. (*Id.* at 78–80.) K.D. stated that she was watching television and listening to music with A.W., T.K., and three boys, when Lee-Kendrick asked her to follow him into a bedroom to talk. (*Id.* at 80–81.) K.D. testified that once they entered the room, Lee-Kendrick locked the door, sat on the bed, and asked her if she was a virgin. (*Id.* at 82.) K.D., who was also sitting on the bed, responded that she was a virgin. (*Id.*) K.D. testified that Lee-Kendrick was wearing a towel wrapped around his waist. (*Id.* at 83.) K.D. testified that Lee-Kendrick told her not to lose her virginity at his house and after she said okay, he put her hand on his penis. (*Id.*) She testified that Lee-Kendrick then pushed her back on the bed and sexually assaulted her. (*Id.* at 88–89.) K.D. testified that she did not struggle because Lee-Kendrick had showed her two guns earlier that day and she was scared. (*Id.* at 86–87.) K.D. testified that Lee-Kendrick ejaculated on her stomach, wiped it up with his towel, and said that it was "our little secret," and walked out of the room. (*Id.* at 89.)

After he left, K.D. put her clothes on, went to the bathroom, and called A.W. and T.K. inside. (*Id.*) K.D. told the other two girls that Lee-Kendrick had assaulted her, and the other girls responded that he had been doing it to them for a long time. (*Id.* at 89–90.) K.D. testified that while the girls were in the bathroom, Lee-Kendrick called A.W.'s phone wanting to speak to K.D. (*Id.* at 90.) K.D. testified that Lee-Kendrick repeated that what happened was their "little secret." (*Id.*) K.D. testified that a little while later, T.K. came back

3

and was crying, stating that "it happened again." (*Id.*) K.D. did not tell anyone about the assault until she was contacted by the River Hills police. (*Id.* at 92.)

T.K. testified that she was Lee-Kendrick's biological daughter and she had known A.W. since she was eleven or twelve. (*Id.* at 110–11.) T.K. testified that her father raped her from the time she was seven years old until she was fifteen years old. (*Id.* at 112.) Although she could not say exactly how many times she was assaulted, T.K. testified that it was more than three times. (*Id.* at 113.) T.K. similarly testified that Lee-Kendrick made her and A.W. perform sex acts on each other and had sex with both girls and recorded it. (*Id.* at 118–19.) T.K. testified that on the night of A.W.'s birthday party, K.D. took them into the bathroom and told them Lee-Kendrick had assaulted her. (*Id.* at 124–25.) However, T.K. denied that anything happened to her that night. (*Id.* at 125.) T.K. also testified that at the end of November or the beginning of December of 2007, after going to the police, she called her father and left him a voicemail message saying that she was sorry and that she "made it all up." (*Id.* at 152–53.) However, T.K. testified that Lee-Kendrick had called her constantly, pressuring her to leave him the message saying she made everything up so that he would not go to jail. (*Id.* at 153–54.)

Lee-Kendrick testified in his own defense. (Transcript of June 2, 2011 A.M. Jury Trial, Answer, Ex. 37, Docket # 31-37.) Lee-Kendrick denied having sexual contact or sexual intercourse with any of the girls and testified that the girls were lying because he threatened to take away material possessions from A.W. and T.K. and because he refused to let A.W. go to her grandmother's house for Thanksgiving. (*Id.* at 109–12.) He testified that

4

K.D. made everything up because she was friends with A.W. and wanted to bolster A.W.'s story. (*Id.* at 112.) Lee-Kendrick did acknowledge, however, that he told K.D. not to lose her virginity at his house. (*Id.* at 121.)

During closing arguments, the State argued the case came down to credibility: if the jurors believed the girls' testimony, they would find Lee-Kendrick guilty. If they believed Lee-Kendrick, they would acquit him. (Transcript of June 3, 2011 P.M. Jury Trial at 31, Answer, Ex. 38, Docket # 31-38.) There was no physical evidence linking Lee-Kendrick to the crimes. (Transcript of June 2, 2011 A.M. Jury Trial at 25, Answer, Ex. 37, Docket # 31-37.) The jury convicted Lee-Kendrick of the three sexual assault charges. (Docket # 31-10 at 3.)

Lee-Kendrick was appointed post-conviction counsel, who filed two post-conviction motions. (*Id.*) First, Lee-Kendrick sought a new trial on the grounds that trial counsel provided ineffective assistance by failing to object to certain questions the State asked Lee-Kendrick on cross-examination and by failing to impeach two of the girls with prior inconsistent statements. (*Id.*) Second, Lee-Kendrick sought resentencing on grounds that the trial court relied on inaccurate information at sentencing. (*Id.*) The post-conviction court denied both motions and Lee-Kendrick appealed. (*Id.* at 3–4.) The court of appeals upheld the denial of the two motions. (*Id.* at 1–18.)

Lee-Kendrick filed a *pro se* Wis. Stat. § 974.06 motion arguing that postconviction counsel provided ineffective assistance for failing to raise trial counsel's ineffectiveness in six separate instances. (*State v. Lee-Kendrick*, Appeal. No. 2016AP627 (Wis. Ct. App. June 27,

5

2017), Answer, Ex. 21, Docket # 31-21.) The trial court denied the motion without a hearing and the court of appeals affirmed. (*Id.*) The Wisconsin Supreme Court denied Lee-Kendrick's petition for review. (Answer, Ex. 23, Docket # 31-23.) On habeas review, Lee-Kendrick raises the issues raised on direct appeal, as well as the six issues raised in his § 974.06 proceedings.

## STANDARD OF REVIEW

Lee-Kendrick's petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a writ of habeas corpus may be granted if the state court decision on the merits of the petitioner's claim (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court" if it is "substantially different from relevant [Supreme Court] precedent." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). The court of appeals for this circuit recognized the narrow application of the "contrary to" clause:

> [U]nder the "contrary to" clause of § 2254(d)(1), [a court] could grant a writ of habeas corpus . . . where the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result.

6

*Washington*, 219 F.3d at 628. The court further explained that the "unreasonable application of" clause was broader and "allows a federal habeas court to grant habeas relief whenever the state court 'unreasonably applied [a clearly established] principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413).

To be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). Under the "unreasonableness" standard, a state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir. 1997). In *Morgan v. Krenke*, the court explained that:

> Unreasonableness is judged by an objective standard, and under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

232 F.3d 562, 565–66 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 532 U.S. 951 (2001). Accordingly, before a court may issue a writ of habeas corpus, it must determine that the state court decision was both incorrect and unreasonable. *Washington*, 219 F.3d at 627.

## ANALYSIS

Lee-Kendrick argues that he is entitled to habeas relief because both his trial counsel and his post-conviction counsel provided ineffective assistance in various ways. I will address each argument in turn.

7

*1.     Ineffective Assistance of Trial Counsel*

1.1     Legal Standard

The clearly established Supreme Court precedent for ineffective assistance of counsel claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance of counsel, Lee-Kendrick must show both "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Id.* at 687. To satisfy *Strickland's* performance prong, the defendant must identify "acts or omissions of counsel that could not be the result of professional judgment." *United States ex rel. Thomas v. O'Leary*, 856 F.2d 1011, 1015 (7th Cir. 1988) (citing *Strickland*, 466 U.S. at 690). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (quoting *Strickland*, 466 U.S. at 689). A reviewing court must seek to "evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. We "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance," *id.*, and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *id.* at 690.

To establish prejudice, it is "not enough for the defendant to show that his counsel's errors had some conceivable effect on the outcome of the [trial]." *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001). A petitioner must show "that there is a reasonable probability that, but for counsel's errors, the result of the [trial] would have been different." *Strickland*,

8

466 U.S. at 694. This does not mean that the defendant must show that "counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. Rather, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Making this probability determination requires consideration of the totality of the evidence before the jury. *Id.* at 695. A "verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

A court deciding an ineffective assistance claim need not approach the inquiry "in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." *Id.*

Here, the Wisconsin Court of Appeals identified the correct governing legal rule (Docket # 31-10 at 4–5); as such, the only issue me before is whether the state court unreasonably applied *Strickland* to the facts of Lee-Kendrick's case or unreasonably determined the facts in light of the evidence presented.

9

## 1.2 Application to this Case

In his direct appeal, Lee-Kendrick argued that his trial counsel was ineffective in several ways. First, he alleged that his trial counsel was ineffective for failing to object to several questions the State asked Lee-Kendrick on cross-examination. Second, he alleged that trial counsel failed to impeach the testimony of two of the victims with prior inconsistent statements. I will address each in turn.

### 1.2.1 Failure to Object to State's Questions

Lee-Kendrick argues his trial counsel erred by failing to object to several questions asked by the State. This argument implicates two interrelated arguments by Lee-Kendrick— that the trial transcript was incorrect and that the court failed to preserve jury communications. The testimony in question involves how Lee-Kendrick acquired the house in River Hills where some of the assaults allegedly occurred and Lee-Kendrick's knowledge of Michael Lock, who Lee-Kendrick asserts was a criminal whose trial and convictions for homicide, drug dealing, kidnapping, and mortgage fraud were sensational and covered extensively in the media during the years before his trial. (Docket # 31-10 at 7.)

The respondent does not contest that the original trial transcript contained an error. A letter in the record from the court reporter to the parties indicates that the trial transcript from June 2, 2011 A.M. contained an error at Page 108, lines 19 and 20—the question and answer regarding Michael Lock. (Docket # 31-18 at 9.) The original transcript omitted the question and answer. However, the court reporter corrected the record and amended the transcript. (*Id.*)

10

In the amended transcript, on cross-examination, the State asked Lee-Kendrick about Michael Lock. The following exchange occurred:

> [State]: How did you afford that home?
>
> [Lee-Kendrick]: I just told you. It was a -- doing a real estate deal that we do through investors. That's how we got the house. The builder lost the house and foreclosure, and we was able to pick it up there.
>
> [State]: Who was your partners?
>
> [Lee-Kendrick]: Actually that was done by guys who always done it. That was done by C&E Mortgage with Chad Lee and, what's his name?
>
> [State]: Michael Lock?
>
> [Lee-Kendrick]: No.
>
> [State]: You know who he is?
>
> [Lee-Kendrick]: I know who he is, yeah.
>
> [State]: He was part of the real estate stuff too, correct?
>
> [Lee-Kendrick]: Yeah, yes. He knew that stuff too, yeah.

(Docket # 31-37 at 108.) The State then moved on to questions about A.W.'s allegations of sexual assault. (*Id.*) For the first time in his reply brief, however, Lee-Kendrick asserts that a different exchange occurred during his cross-examination. Lee-Kendrick argues the correct exchange was as follows:

> [State]: How did you afford that home?
>
> [Lee-Kendrick]: I just told you I did real estate deals.

11

> [State]: You know Michael Lock, don't you?
>
> [Lee-Kendrick]: Yeah, I've heard of him, but I don't know him.
>
> [State]: 'Cause he does that stuff to, don't he?
>
> [Lee-Kendrick]: I don't know, I guess so.

(Petitioner's Reply Br. at 4, Docket # 48.) Lee-Kendrick was also questioned regarding how he obtained the River Hills house, which the girls referred to as a mansion during the trial. In the amended transcript, Lee-Kendrick testified as follows on direct examination:

> When I stopped doing car stereos, I started doing small computer networking and stuff like that and went from that to meeting a guy who was getting rid of a lot of houses. And I came up with a program that actually-- Well, I'm able to buy and sell property as an investment consultant but actually selling to urban community. Like single parent, single mother or single father, that couldn't get the property. I was able to get them to them through my investors and stuff.

(Docket # 31-37 at 84–85.) Lee-Kendrick argued before the court of appeals that the trial transcript contained an error regarding this testimony. He argues that this testimony was not regarding how he obtained the River Hills house; rather, the above testimony appeared a few pages earlier in his direct examination when his attorney was questioning him about his past employment. He argues the correct testimony is as follows:

> [Counsel]: Okay. And the next [job] after that?
>
> [Lee-Kendrick]: American Teens. After American Teens I worked for a place called Evans Brothers Trucking, and somewhere during Evans Brothers Trucking, I kind of started doing car stereo systems and got into a -- got into a partnership with a Korean guy. We had kinds of a business together. I install. He sell the stuff. **When I stopped doing car stereos, I started doing small computer networking and stuff like**

12

> **that and went from that to meeting a guy who was getting rid of a
> lot of houses. And I came up with a program that actually-- Well,
> I'm able to buy and sell property as an investment consultant but
> actually selling to urban community. Like single parent, single
> mother or single father, that couldn't get the property. I was able to
> get them to them through my investors and stuff.**

(Docket # 31-18 at 75.) Lee-Kendrick also argues that testimony from his direct

examination was placed into his cross-examination. Specifically, on direct, when

explaining how he obtained the River Hills mansion, the amended transcript states as

follows:

> [Lee-Kendrick]:  It's a story of getting the place. The way we do the
> deals with the houses, we able to catch them at low values, and we pay
> the mortgages on them. And the house in Germantown was brand
> new, built from the ground. Before the builder lost it, we took over it
> and that is how I got that. But for the same price I had that one, a
> friend of mine. . . about to lose the mansion, so I  helped him get that
> house, and I was able to obtain that one. I really didn't want the
> mansion. I really, truly got the house for the kids.

(Docket # 31-37 at 85.) The amended transcript shows Lee-Kendrick testified as follows on

cross-examination regarding how he obtained the house:

> [State]: How did you afford that home?
>
> [Lee-Kendrick]: I just told you. It was a -- doing a real estate
> deal that we do through investors. That's how we got the house. **The
> builder lost the house and foreclosure, and we was able to pick it up
> there.**

(Docket # 31-37 at 108.) Lee-Kendrick argues the highlighted text was not referring to the

River Hills house, but to a home he previously lived at in Germantown. He asserts the

highlighted text belonged in his direct examination, as follows:

13

> [Lee-Kendrick]: It's a story of getting the place. The way we do the deals with the houses, we able to catch them at low values, and we pay the mortgages on them. And the house in Germantown was brand new, built from the ground. **The builder lost the house and foreclosure, and we was able to pick it up there.** Before the builder lost it, we took over it and that is how I got that. But for the same price I had that one, a friend of mine. . . about to lose the mansion, so I helped him get that house, and I was able to obtain that one. I really didn't want the mansion. I really, truly got the house for the kids.

(Docket # 31-18 at 75.) Finally, Lee-Kendrick asserts that the question the State allegedly asked him on cross-examination, "Who was your partners?" and his response "Actually that was done by guys who always done it," (*id.* at 108) belonged during his direct examination regarding how he obtained the house in River Hills (Docket # 31-18 at 75).

Prior to reading the jury's verdict, the trial court put on the record the questions he received from the jury during deliberations. The court noted that the jury asked how Lee-Kendrick got the money to buy the house in River Hills. (Docket # 31-39 at 4.) The court found that the question was irrelevant and thus would not give the jury the portion of the transcript of Lee-Kendrick's testimony addressing it. (*Id.*) The court noted that there were two other questions from the jury, but that he did not remember what they were, and he did not have them in front of him. (*Id.*)

Lee-Kendrick argues that the two questions the jury asked were: "Was Michael Lock Lee-Kendrick's partner?" and "How did Lee-Kendrick know Michael Lock?" (Petitioner's Reply Br. at 4.) Although not in the record, Lee-Kendrick asserts that the jury asked these same questions after his testimony. (*Id.*)

14

Lee-Kendrick argued his trial counsel should have objected to the State's questions regarding his ability to pay for the house and the questions regarding Michael Lock. (Docket # 31-10 at 7.) Lee-Kendrick argued that the questions were irrelevant and prejudicial and left the jury with the impression that Lee-Kendrick was somehow involved with Lock and his criminal organization. (*Id.* at 8.)

The court of appeals found that Lee-Kendrick was not prejudiced by counsel's failure to object to the State's questions. As to his ability to acquire the house, the court of appeals found that it "fail[ed] to see how Lee-Kendrick's financing for the home where the alleged assaults took place would have affected the jury's determination of Lee-Kendrick's and the girls' credibility." (*Id.*) As to the questions regarding Lock, the court of appeals found that Lock was only mentioned that single time in the entire trial and there was no indication in the record that the jurors knew who Lock was or would have drawn negative conclusions about Lee-Kendrick because of hearing the name once. (*Id.* at 8–9.)

The crux of Lee-Kendrick's argument rests on the alleged inaccuracies in the record. He argues that if all of the references to Lock appeared in the record as he asserts— including the questions from the jury—it would show that Lock had a greater impact than what the court of appeals found. Even assuming that Lee-Kendrick's unsworn assertions regarding how the record should read are accurate, I do not find the court of appeals erred. Under either version of the transcript, Lee-Kendrick testified that he only knew of Lock, but did not work with him. Lee-Kendrick overemphasizes the exchanges regarding Lock and his finances. While the jury may have been curious about these things (specifically asking how

15

he got the money to buy the River Hills house), as the trial court found, the questions were irrelevant to the allegations of sexual assault.

Nonetheless, I do not agree with the respondent that the State's mention of Lock's name was innocent. The respondent argues that the State was merely offering the name of someone who was also involved in real estate transactions when Lee-Kendrick was searching his memory for the name of his business partner. (Resp. Br. at 25, Docket # 46.) The transcript reads more like an inappropriate cheap shot taken at the defendant. Even so, Lee-Kendrick has not demonstrated that the court of appeals unreasonably applied *Strickland* to the facts of his case or unreasonably determined the facts in light of the evidence presented.

### 1.2.2   Failure to Impeach Witnesses

Lee-Kendrick argues that his trial counsel was ineffective for failing to impeach K.D. and A.W.'s testimony with prior inconsistent statements. Regarding K.D.'s testimony, Lee-Kendrick argues that during trial, she testified that Lee-Kendrick ejaculated on her stomach and wiped it up with his towel; whereas she initially told police that he ejaculated on the bed and testified during the preliminary hearing that he ejaculated on her stomach and the bed. (Petitioner's Br. at 12.) Lee-Kendrick also argues that K.D. testified at trial and told officers that T.K. told her that Lee-Kendrick sexually assaulted her on the same night K.D. was allegedly assaulted; whereas T.K. testified at trial that she was not assaulted that night. (*Id.*) Lee-Kendrick argues that K.D. told police and testified at the preliminary hearing that Lee-

16

Kendrick held her down when he assaulted her and that she resisted, while she testified at trial that she did not resist because she was afraid because he showed her guns. (*Id.*)

Regarding A.W.'s testimony, Lee-Kendrick argues that A.W. told police that she knew T.K. was assaulted because T.K. told her (i.e., she never told police that she witnessed T.K. be assaulted); whereas at trial she testified that on at least two occasions, Lee-Kendrick made A.W. and T.K. perform sex acts together. (*Id.*) Lee-Kendrick argues that because this case turned on the credibility of the witnesses, trial counsel's failure to impeach A.W. and K.D. with these inconsistencies prejudiced him. (*Id.*)

As an initial matter, Lee-Kendrick failed to argue before the Wisconsin Court of Appeals the inconsistency between K.D.'s preliminary hearing testimony regarding holding her down and assaulting her and her trial testimony regarding not resisting because she was afraid of him. (Docket # 31-7, Docket # 31-9.) While he generally argues that the record is "riddled with numerous inconsistencies" that his appellate counsel failed to present (Petitioner's Br. at 11), by failing to either raise this specific issue before the court of appeals or raise ineffective assistance of appellate counsel through a *State v. Knight*, 168 Wis. 2d 509, 484 N.W.2d 540 (1992) petition, Lee-Kendrick procedurally defaulted this claim. Additionally, T.K.'s testimony that she was not assaulted on the night of A.W.'s birthday party is not a prior inconsistent statement of K.D. Rather, the two statements are simply inconsistent statements between two witnesses, both of which were presented to the jury.

As to K.D.'s prior statements regarding where Lee-Kendrick ejaculated, the court of appeals found that the discrepancies were not so obvious as to suggest that K.D.'s credibility

17

would have been seriously undermined, and that trial counsel effectively explored multiple issues to undermine K.D.'s credibility. (Docket # 31-10 at 11.) As the court of appeals noted, by the time of trial, the preliminary hearing had been three-and-a-half years prior (*id.* at 10), and the alleged incident over four years prior (Docket # 31-36 at 27). Whether Lee-Kendrick ejaculated on K.D.'s stomach, the bed, or her stomach and the bed, this does not undermine K.D.'s testimony sufficiently enough to undermine confidence in the outcome of the trial.

Regarding the failure to impeach A.W.'s testimony, the court of appeals found that trial counsel thoroughly cross-examined A.W., including asking her many questions designed to cast doubt on her credibility. (Docket # 31-10 at 12.) The court of appeals further found that even though A.W. did not mention the fact that Lee-Kendrick made A.W. and T.K. perform sex acts together to the police during her initial police interview, she did testify about those sex acts during the preliminary hearing. (*Id.*) Thus, if counsel would have impeached A.W. with her police statement, the State would have simply rehabilitated her with her preliminary hearing testimony. (*Id.*) Again, Lee-Kendrick has not shown that this alleged failure by counsel undermined confidence in the outcome of the trial. Thus, Lee-Kendrick has not demonstrated the court of appeals erred. He is not entitled to habeas relief on the ground of ineffective assistance of trial counsel.

18

2. *Sentencing on Inaccurate Information*

Lee-Kendrick argues that his due process rights were violated because the trial court relied on inaccurate information in sentencing him. A defendant has a constitutional right to be sentenced based on accurate information. *Promotor v. Pollard*, 628 F.3d 878, 888 (7th Cir. 2010). A defendant who requests resentencing due to the use of inaccurate information at the original sentencing must show both that the information before the sentencing court was inaccurate and that the sentencing court relied on the inaccurate information in the sentencing. *United States v. Tucker*, 404 U.S. 443, 446-47 (1972); *United States ex rel. Welch v. Lane*, 738 F.2d 863, 865 (7th Cir. 1984). A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Lechner v. Frank*, 341 F.3d 635, 639 (7th Cir. 2003) (internal citation omitted).

Because the court of appeals proceeded under the appropriate legal framework (Docket # 31-10 at 15), the only issue on habeas review is whether the state court unreasonably applied the law to the facts of Lee-Kendrick's case or unreasonably determined the facts in light of the evidence presented.

During cross-examination, the State asked Lee-Kendrick where he was staying from the time the police began investigating the allegations in November 2007 until early December 2007, when he turned himself in, to which Lee-Kendrick testified "[p]robably at a hotel." (Docket # 31-37 at 113). On redirect, Lee-Kendrick testified as follows regarding his decision to stay away from the house while the police investigated the alleged assaults:

19

> Well, my attorney first told me, The police don't have no reason for you--
> They probably searched the house or stay away from-- You stay out of the
> way. I'll contact you if a warrant come or what's going on, but right now you
> don't need to be questioned. He said he sent something to them that he
> obtained me, see if they wanted to meet in the morning. Yeah, the morning
> that he displayed all this stuff on the TV. The next morning a warrant was out
> for my arrest, and I turned myself in.

(*Id.* at 121.) During sentencing, the trial court spoke about Lee-Kendrick's testimony as

follows:

> Then for you to get on the witness stand and lie and perjure yourself is
> unbelievable, those three girls were very believable to the jury. And for you to
> come up with this cock and bull story that [A.W.] and [T.K.] were upset with
> you because you disciplined them like any father should by taking away their
> cellphones when they were in trouble or restricting their privileges; and
> therefore, they invented this against you and somehow convinced their friend
> to go along with it. That is absurd.
>
> And when I was taking notes during the trial, that is exactly what I wrote
> down in big, bold letters, absurd. Then after you are accused of this thing, do
> you do what any innocent man would do? Do you go to the police and
> righteously deny this and show indignation? My God, I didn't do this, these
> kids are lying. No, you stay at large for almost a month, hiding in some hotel.
>
> And for you to say some lawyer advised you to do it is absolutely ridiculous.
> Any lawyer that would advise you to do that, frankly, doesn't deserve his
> ticket to practice law; and I categorically reject the fact that a lawyer told you
> to stay at large and hide from the police.

(Transcript of Sentencing Hearing at 23–24, Answer, Ex. 40, Docket # 31-40.) Lee-

Kendrick argues that the sentencing judge found that he was "hiding" from the police at the

behest of his attorney, when his attorney merely told him to stay in a hotel to "stay out of

the way" until an arrest warrant was issued for him. (Petitioner's Br. at 13.) In other words,

20

Lee-Kendrick emphasizes that he was not "hiding" from the police when he failed to immediately turn himself in.

The court of appeals first found that the information before the sentencing court was not inaccurate. The sentencing court found that he did not believe that Lee-Kendrick's lawyer told him to stay at large and hide from the police. The court of appeals found that Lee-Kendrick failed to show "that his attorney told him 'to stay at large and hide from the police,' which is the fact the trial court determined was untrue." (Docket # 31-10 at 15.) Thus, the court of appeals concluded that Lee-Kendrick did not show that the information mentioned by the trial court was inaccurate. (*Id.* at 15–16.)

The court of appeals misconstrues Lee-Kendrick's argument. Lee-Kendrick did not assert that his attorney told him to "hide" from the police; rather, his argument was that he was not "hiding" from the police at all, either on his attorney's instruction or on his own volition. Rather, Lee-Kendrick states that he was "staying out of the way" at a hotel until an arrest warrant was issued. Thus, the "inaccurate information" Lee-Kendrick alleges the trial court relied on was that he was "hiding" from the police.

Although the court of appeals erred in its analysis of whether the information before the sentencing court was indeed inaccurate, Lee-Kendrick is not entitled to habeas relief on this ground because the court of appeals correctly found that the sentencing court did not rely on this information at sentencing. The court of appeals held that while the sentencing court mentioned the allegedly incorrect "hiding" fact while sentencing Lee-Kendrick, a "closer examination of the entire sentencing transcript" shows:

> [T]hat the facts the trial court actually relied on in imposing sentence were: Lee-Kendrick abused two of the girls for a three-year period; Lee-Kendrick let the girl visiting his home drink alcohol the night he assaulted her; Lee-Kendrick offered an "absurd" reason why the girls would fabricate their reports of sexual assault; Lee-Kendrick had shown no remorse; and there was evidence that while the investigation was pending, Lee-Kendrick had friends and relatives "go into the mansion in River Hills and take and destroy and hide stuff."

(Docket #31-10 at 17.) The court of appeals determined that the sentencing court's statements on Lee-Kendrick "hiding" were merely a comment on what it believed was a pattern of untruths in Lee-Kendrick's testimony. (*Id.* at 16.) The court of appeals' determination is not an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. For these reasons, Lee-Kendrick has not shown that he is entitled to habeas relief on this ground.

### 3. Ineffective Assistance of Postconviction Counsel

Lee-Kendrick argues his postconviction counsel was ineffective for failing to present claims of ineffective assistance of trial counsel. Specifically, trial counsel's failure to: (1) argue improper joinder; (2) call Kendrella Keeler as a witness; (3) use the actual voicemail message left by T.K. in which she apologized; (4) move to dismiss all charges based on destruction of exculpatory evidence; (5) argue error based on the court's failure to fully preserve jury communications; and (6) dispute the accuracy of the transcripts. I will address each argument in turn.

22

### 3.1    Legal Standard

As an initial matter, I must address whether I can even consider Lee-Kendrick's claim of ineffective assistance of postconviction counsel. Section 2254(i) provides that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."

Under Wisconsin criminal procedure, issues involving the ineffective assistance of trial counsel are raised in Wis. Stat. § 974.02 motions before the trial court and issues of ineffective assistance of postconviction counsel are raised in Wis. Stat. § 974.06 motions before the trial court. Lee-Kendrick argues that postconviction counsel, who filed the initial motion pursuant to Wis. Stat. § 974.02, was ineffective for failing to raise additional grounds of ineffective assistance of trial counsel. Courts in this district have found that challenging postconviction counsel's failure to preserve the issue of ineffective assistance of trial counsel for direct appeal does not regard counsel's performance during a collateral proceeding, and thus is not precluded by 28 U.S.C. § 2254(i). *Nelson v. Huibregtse*, No. 07-C-1022, 2009 WL 73149, at *4 n.1 (E.D. Wis. Jan. 6, 2009); *McCloud v. Jenkins*, No. 07-C-1050, 2007 WL 4561108, at *4 n.1 (E.D. Wis. Dec. 21, 2007).

Subsequent to those cases, however, the Seventh Circuit decided *Huusko v. Jenkins*, 556 F.3d 633, 635 (7th Cir. 2009), and questioned whether Wisconsin's procedure in § 974.02 should be deemed "collateral," noting that in federal court and most state courts, a hearing to inquire into the effectiveness of trial counsel is normally a collateral proceeding. *Id.* at 635–36. The court noted that if Wisconsin's § 974.02 proceeding was deemed non-

23

collateral and therefore outside the scope of § 2254(i), then "Wisconsin's prisoners will enjoy a right to effective assistance of counsel in pursuing ineffective-assistance contentions, even though prisoners in Indiana, Illinois, and most other states do not enjoy such a right." *Id.* at 636. Having posed the question, the court decided not to answer it, noting that the state had waived it and petitioner's claim failed on the merits. *Id.* at 635.

In *Hipler v. Hepp*, No. 09-CV-371, 2010 WL 1687873, at *5–6 (W.D. Wis. Apr. 23, 2010), the court also questioned, based on *Huusko*, whether it could consider the petitioner's claim of ineffective assistance of postconviction counsel. However, as in *Huusko*, the court found the issue was not dispositive and thus concluded that "'it is best to wait for an adversarial presentation, in a case where the answer matters, before addressing whether § 2254(i) applies.'" *Id.* at *5 (quoting *Huusko*, 556 F.3d at 635). *See also Adams v. Richardson*, No. 10-CV-11, 2018 WL 6033491, at *4 (E.D. Wis. Nov. 16, 2018) (assuming, without deciding, that petitioners' ineffective assistance of postconviction counsel claims were not barred by § 2254(i)).

In an unpublished decision subsequent to *Huusko*, the Seventh Circuit noted that while it had previously raised the question of whether a posttrial motion under § 974.02 was considered collateral, "more recently—as advocated by Wisconsin—we have understood a § 974.02 motion to be a step toward a defendant's direct appeal, *see Nash v. Hepp*, 740 F.3d 1075, 1079 (7th Cir. 2014). And for a direct appeal the assistance of counsel is constitutionally guaranteed." *London v. Clements*, 600 F. App'x 462, 466 (7th Cir. 2015). Given the Seventh Circuit's more recent position (albeit stated in a nonprecedential

24

disposition) and the respondent's failure to raise the issue, I will assume, without deciding, that Lee-Kendrick's ineffective assistance of postconviction counsel claims are not barred by § 2254(i).

The Sixth Amendment, made applicable to the states by way of the Due Process Clause of the Fourteenth Amendment, *see Gideon v. Wainwright*, 372 U.S. 335 (1963), entitles a criminal defendant to the effective assistance of counsel not only at trial, but during his first appeal as of right, *Evitts v. Lucey*, 469 U.S. 387 (1985). The appropriate standard for evaluating a claim of ineffective assistance of appellate counsel is the standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Winters v. Miller*, 274 F.3d 1161, 1167 (7th Cir. 2001).[1] The general *Strickland* standard governs claims of ineffective assistance of appellate counsel as well as trial counsel, "but with a special gloss when the challenge is aimed at the selection of issues to present on appeal." *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015). Because appellate counsel is not required to raise every non-frivolous issue on appeal, appellate counsel's performance is deficient under *Strickland* only if she fails to argue an issue that is both "obvious" and "clearly stronger" than the issues actually raised. *Id.* at 898. Proving that an unraised claim is clearly stronger than a claim that was raised is generally difficult "because the comparative strength of two claims is usually debatable." *Id.* (internal quotation and citation omitted).

---

[1] Although Lee-Kendrick does not challenge postconviction counsel's performance in the court of appeals, but in the § 974.02 proceeding in the trial court (which is how claims of how ineffective assistance of trial counsel must be made in Wisconsin), given the nature of the proceedings (i.e., Lee-Kendrick challenges post-conviction counsel's failure to raise specific arguments), I consider counsel's performance using the appellate attorney "clearly stronger" standard of *Strickland. See Hipler*, 2010 WL 1687873, at *6 n.2.

### 3.2    Procedural Default

The respondent argues that Lee-Kendrick's ineffective assistance of postconviction counsel claims are procedurally defaulted because the court of appeals concluded that his claims were barred under *State v. Escalona-Naranjo*, 185 Wis. 2d 168, 517 N.W.2d 157 (1994). (Resp. Br. at 35, Docket # 46.) In *Escalona–Naranjo*, the court held that constitutional claims that could have been raised on direct appeal or in a § 974.02 postconviction motion cannot later be the basis for a collateral motion pursuant to § 974.06. *Page v. Frank*, 343 F.3d 901, 907 (7th Cir. 2003) (citing *Escalona–Naranjo*, 517 N.W.2d at 162). The respondent argues that the state court decisions constitute an independent and adequate state ground that bars federal habeas review. (*Id.*) While the respondent is correct that the procedural bar created by *Escalona–Naranjo* has been held an adequate and independent state law ground for procedural default, *see Perry v. McCaughtry*, 308 F.3d 682, 692 (7th Cir. 2002), the Seventh Circuit has also found it inadequate to preclude federal review where, as here, it is used to prevent review of a defendant's claim that postconviction counsel was ineffective for failing to raise deficiencies in the representation provided by trial counsel, *see Page*, 343 F.3d at 909. Both the trial court and the court of appeals in this case addressed Lee-Kendrick's claims on the merits after recognizing that ineffective postconviction counsel may constitute a sufficient reason for avoiding the *Escalona–Naranjo* bar. (Docket # 31-21 at 3, 6.) Thus, I do not find that review of Lee-Kendrick's claims of ineffective assistance of postconviction counsel are barred by procedural default.

26

### 3.3 Application to this Case

Lee-Kendrick does not address the deficiency of postconviction counsel from the aspect of the issues postconviction counsel chose to raise on appeal. Rather, Lee-Kendrick effectively addresses trial counsel's alleged errors pursuant to *Strickland*. The court of appeals noted this, stating that while Lee-Kendrick correctly identified the "clearly stronger" test in his motion, he failed to apply it. (Docket # 31-21 at 5.) Despite this failure, both the circuit court and the court of appeals addressed his claims on the merits. (*Id.* at 6.) Given Lee-Kendrick's *pro se* status, the fact both parties briefed the issues on the merits, and the fact the court of appeals addressed the issues on the merits, I will also address Lee-Kendrick's claims on the merits.

#### 3.3.1 Failure to Argue Misjoinder

Lee-Kendrick was charged with two counts of repeated sexual assault of a child and one count of second-degree sexual assault of a child. (Docket # 31-10 at 1.) The jury also considered four additional charges from a separate criminal case that was joined for trial: three counts of possession of child pornography and one count of child sexual exploitation. (*Id.* at 2.) Lee-Kendrick was acquitted of the child pornography and child sexual exploitation charges. (*Id.*) He argues that his postconviction counsel was ineffective for failing to challenge trial counsel's decision not to argue misjoinder. Specifically, Lee-Kendrick argues that the sexual assault charges involving K.D. were improperly joined with the sexual assault, child pornography, and sexual exploitation charges concerning A.W. and T.K. because there was no overlapping evidence. (Petitioner's Br. at 16.)

27

The court of appeals found that there was adequate overlapping evidence supporting initial joinder. (Docket # 31-21.) Specifically, all three victims were under age sixteen and Lee-Kendrick allegedly assaulted them at his River Hills home. (*Id.*) Lee-Kendrick allegedly forced all three girls to engage in penis-to-vagina intercourse with him and Lee-Kendrick "asserted his authority" as a father figure or adult to isolate each girl from other people. (*Id.* at 6–7.) The court of appeals also noted that the circuit court found that even if trial counsel should have moved to sever the offenses involving K.D., the failure was harmless because evidence of the assaults on A.W. and T.K. would have been admissible in a separate trial. (*Id.* at 7 n.4.)

Lee-Kendrick has not demonstrated that the court of appeals' decision contravenes *Strickland*. Given the fact the joinder statute under Wisconsin law is to be broadly construed in favor of initial joinder and given the similarity between the offenses as noted by the court of appeals, (*id.* at 6–7), I fail to see how trial counsel's performance was deficient by not moving to sever the counts. If trial counsel was not ineffective for failing to move to sever the counts, then postconviction counsel was not ineffective for failing to raise this issue. Lee-Kendrick is not entitled to habeas relief on this ground.

### 3.3.2   Failure to Call Keeler as a Witness

Lee-Kendrick argues his postconviction counsel erred by failing to raise ineffective assistance of trial counsel on the ground that trial counsel failed to investigate and present testimony from Kendrella Keeler. (Petitioner's Br. at 22–27.) In August 2009, the State Public Defender's office received an investigation report containing a summary of the

28

investigator's interview with Keeler. (Docket # 31-18 at 76–79.) Keeler, who was eighteen years old, had known Lee-Kendrick since seventh grade and A.W. since elementary school. (*Id.* at 76.) Keeler stated that she was no longer friends with A.W. because of "what [A.W.] did to [Lee-Kendrick]." (*Id.*) Keeler stated that on the day the police were called to A.W.'s house, Keeler was over visiting with A.W. and her family. (*Id.*) She stated that she was playing cards with A.W. when A.W. blurted out that she was going to get Lee-Kendrick in trouble by any means necessary for coming between A.W. and her mother. (*Id.* at 77.) Keeler stated that A.W. said she was "going to tell the police that [Lee-Kendrick] was making her have sex with him since she was 12." (*Id.*) Keeler stated that she always visited at the house and "nothing was going on." (*Id.*)

Keeler stated that she saw A.W. get angry with Lee-Kendrick at least twice because he punished her for having bad grades. (*Id.*) After Lee-Kendrick took Keeler home that day, Keeler received a call from A.W. telling her that she called the police on Lee-Kendrick. (*Id.*) Keeler stated that she said to A.W. "What are you doing?" and "Why would you call the police," but A.W. did not answer and hung up the phone. (*Id.*) Keeler tried calling A.W. back, but she did not answer. (*Id.*) Keeler stated that Lee-Kendrick called her around 11:30 p.m. that night asking her what was going on. (*Id.*) Keeler told Lee-Kendrick what A.W. said about making her have sex with him. (*Id.*) Keeler stated that she was willing to testify on Lee-Kendrick's behalf and told Lee-Kendrick's attorney at the time as much. (*Id.* at 78.)

The court of appeals found that trial counsel's failure to call Keeler as a witness was not prejudicial because: Keeler was not at the house at the times of the assaults so she had

no direct knowledge of the crimes charged; Keeler initially did not think much of A.W.'s comment because A.W. had been mad at Lee-Kendrick in the past; and Keeler's testimony was inconsistent with the defense theory that A.W. and T.K. fabricated allegations because Lee-Kendrick was depriving them of material possessions. (Docket # 31-21 at 7–8.)

While I may disagree with the court of appeals' assessment of Keeler's potential importance as a witness, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *See Morgan*, 232 F.3d at 565–66. Rather, for the writ to issue, the court of appeals' decision must also be unreasonable. *Washington*, 219 F.3d at 627. As the court of appeals found, Lee-Kendrick specifically testified that A.W. and T.K. made up the assaults because he took away material possessions and did not allow A.W. to go to her grandmother's house. Thus, it was not unreasonable for the court of appeals to conclude that Keeler's testimony that A.W. wanted to get Lee-Kendrick in trouble for coming between A.W. and her mother was inconsistent with Lee-Kendrick's theory that the girls fabricated the assaults because he took away material possessions and did not allow A.W. to go to her grandmother's house.

Moreover, Keeler's statement was not the sole piece of evidence discrediting A.W. Trial counsel thoroughly cross-examined A.W., pointing to the fact that she did not report the assaults to anyone until years after the assaults allegedly began and the fact that Lee-Kendrick was disciplining her for poor behavior at school. (Docket # 31-36 at 48, 63–64.) The jury also heard evidence from Lee-Kendrick that A.W. had "act[ed] out like this

30

before" and was angry at him for disciplining her and cutting off her material possessions. (Docket # 31-37 at 104, 110–11.) The jury heard conflicting testimony between A.W. and the other victims, including the fact that A.W. testified that Lee-Kendrick was wearing a shirt on the night of her birthday party (Docket # 31-36 at 54) while K.D. testified he was just wearing a towel (*id.* at 83). For these reasons, the failure to call Keeler as a witness does not undermine confidence in the outcome of the trial. Lee-Kendrick is not entitled to habeas relief on this ground.

### 3.3.3   The Voicemail Message

On cross-examination, Lee-Kendrick's counsel asked T.K. whether she made a telephone call to her father apologizing and denying that the assaults occurred. (Docket # 31-36 at 136–37.) She admitted that she did. (*Id.*) On re-direct, T.K. testified that her father was constantly calling her and asking her to leave a message saying that she was sorry and that she made it all up so that he would not go to jail. (*Id.* at 152–53.) She testified that she felt pressured by Lee-Kendrick to leave the message and that the message was untrue. (*Id.* at 155.) She reiterated that she was sexually assaulted by her father. (*Id.* at 156.)

While T.K. was questioned about the voicemail message, the actual recording of the message was not played for the jury. Lee-Kendrick argues that his postconviction counsel was ineffective for failing to argue his trial counsel was ineffective for failing to introduce and use the actual voicemail message. (Petitioner's Br. at 27–30.) Lee-Kendrick argues that T.K. is "noticeably sincere and heartfelt" in the message and the jury could not properly evaluate T.K.'s credibility without hearing the actual voicemail message. (*Id.* at 29.)

31

The full text of the voicemail message states as follows:

> Hey daddy. I've been trying to call you all day (*inaudible*) to call to tell you that I'm sorry about lying about everything (*inaudible*), I (*inaudible*) could not figure out how to come to the phone. All right and um Ashley was lying (*inaudible*) told me she was making me cause problems about lying about everything. All right (*slang*) love you.

(Docket # 31-18 at 81.) T.K. sounds tearful and upset in the message. (Docket # 38, Supplemental Ex. 1.) The court of appeals found that the voicemail message itself was cumulative because T.K. testified about the contents of the message. (Docket # 31-21 at 8.) The court of appeals concluded that the omission of cumulative evidence was not prejudicial. (*Id.*)

Lee-Kendrick has not shown the court of appeals' finding contravenes *Strickland*. While hearing the tone of T.K.'s voice in real time may have been stronger evidence than hearing T.K. recount the message on the stand, Lee-Kendrick has not shown a reasonable probability that admission of the voicemail message itself would have changed the outcome of the trial. While the jury may, as Lee-Kendrick argues, have believed T.K. sounded sincere in her recantation, the jury may just as likely have believed that T.K. sounded upset in the message because, as she testified, her father was pressuring her to leave the message. Lee-Kendrick is not entitled to habeas relief on this ground.

### 3.3.4 Failure to Move for Admission of DNA Evidence

Sergeant Milton Mrozak of the River Hills Police Department testified that A.W. stated that she was assaulted at the River Hills residence, in various rooms, on the beds. (Docket # 31-37 at 23.) Sergeant Mrozak testified that upon executing a search warrant of

32

the residence, an article of bedding was recovered. (*Id.* at 23–24.) He testified that the bedding was sent to the crime lab for testing; however, nothing incriminating linked to Lee-Kendrick was found on the bedding. (*Id.* at 24–25.) Lee-Kendrick's counsel asked Sergeant Mrozak the following question: "But they did find something; did they not?" to which the State objected and asked for a sidebar. (*Id.*) Defense counsel then withdrew the question and the jury was ordered to disregard the question. (*Id.*) Sergeant Mrozak confirmed that bedding was only taken from one of the rooms. (*Id.* at 29.)

Lee-Kendrick argues that the officers' failure to secure all of the bedding from the rooms the girls alleged they were assaulted in was tantamount to the destruction of potentially exculpatory evidence. (Petitioner's Br. at 32.) Lee-Kendrick further argues that semen was indeed found on the bedding collected by law enforcement and DNA testing excluded Lee-Kendrick. (*Id.* at 38.)

The court of appeals rejected these arguments, citing *Arizona v. Youngblood*, 488 U.S. 51 (1988) and *State v. Greenwold*, 189 Wis. 2d 59, 525 N.W.2d 294 (Ct. App. 1994) for the proposition that one's due process rights are violated if the police either (1) fail to preserve apparently exculpatory evidence or (2) act in bad faith by failing to preserve potentially exculpatory evidence. (Docket # 31-21 at 9.) The court of appeals also found that introducing the test results to show that the DNA belonged to someone else would have been inadmissible under the Rape Shield law. (*Id.*) Furthermore, the court of appeals noted that the jury was informed that no incriminating evidence connected Lee-Kendrick to the

33

bedding. (*Id.* at 9 n.7.) The court of appeals concluded that trial counsel was not ineffective for failing to make a motion that would not have been granted. (*Id.* at 10.)

Lee-Kendrick has not shown the court of appeals erred. When asked why he did not secure the home and obtain a search warrant the same night he was called to the River Hills home, Sergeant Mrozak testified that the information he had at the time from A.W. was that the latest sexual assault occurred a week prior; thus, he did not believe they had probable cause to secure the home and obtain a search warrant at that time. (*Id.* at 15–16.) Lee-Kendrick has not demonstrated that the officers acted in bad faith by failing to secure all of the bedding in the residence. Even if the bedding was collected that night and it failed to show Lee-Kendrick's DNA, this does not mean the assaults did not occur. As Sergeant Mrozak testified, a week had past from the time of the last alleged assault. The bedding could have been washed in the interim.

Similarly, even if the jury was told that semen with someone else's DNA was found on bedding in one of the rooms, this again does not mean the sexual assaults did not occur. It is unclear when the DNA from someone else got on the bedding, but this single instance does not negate the victim's testimony that the assaults occurred over several years at multiple residences. The strongest evidence in favor of Lee-Kendrick was presented to the jury—no DNA evidence connecting Lee-Kendrick to the alleged assaults was found. Thus, Lee-Kendrick is not entitled to habeas relief on this ground.

### 3.3.5 Failure to Preserve Juror Communications

During deliberations, the jury asked a number of written questions. It is a bit unclear from the transcript how many questions were asked. The court initially stated that he received two communications from the jury. (Docket # 31-39 at 3.) He put the first communication on the record, which was a question regarding how Lee-Kendrick could afford the house in River Hills. (*Id.* at 3–4.) The court found this question irrelevant to the charges against him. (*Id.* at 4.) As to the second communication, he stated that he did not have the "questions here in front of [him]" but that it related to a conversation Lee-Kendrick had on the phone with the girls in the bathroom. (*Id.*) He then stated, "I don't remember what the other two were." (*Id.*)

Lee-Kendrick argues that he was present in the courtroom when the judge initially identified a number of questions from the jury and that one of the questions was how Lee-Kendrick knew Michael Lock. (Petitioner's Br. at 40.) Lee-Kendrick's counsel attempted to obtain the missing juror communications but was unable to do so. (*Id.* at 42.) In his reply brief, Lee-Kendrick asserts that the two questions the jury asked were: "Was Michael Lock Lee-Kendrick's partner?" and "How did Lee-Kendrick know Michael Lock?" (Petitioner's Reply Br. at 4.)

The court of appeals found that any failure to preserve the juror communications was harmless error, because the question regarding how Lee-Kendrick could afford the house was not relevant to the disposition of guilt and the jury was told to rely on their collective memories of the testimony. (Docket # 31-21 at 10.) As stated above, the crux of Lee-

Kendrick's argument rests on the questions he alleges were omitted from the transcript. While he asserts in his brief that he is "adamant about the questions that were asked," he has no evidence of this beyond his unsworn assertion. (Petitioner's Br. at 42.) Even if the jurors did ask the question about Lock, however, it is unclear how counsel acted ineffectively. Lee-Kendrick specifically testified that although he knew who Lock was, he was not one of his partners. (Docket # 31-37 at 108.) The court instructed the jurors to rely on their memories of the testimony. Furthermore, just as how Lee-Kendrick was able to afford the River Hills home was irrelevant to whether he committed the assaults, so is how Lee-Kendrick came to hear of Lock. The court of appeals' decision did not contravene *Strickland* and Lee-Kendrick is not entitled to relief on this ground.

### 3.3.6   Failure to Dispute Transcript

Lee-Kendrick argues his postconviction counsel was ineffective for failing to argue trial counsel was ineffective for failing to dispute the accuracy of the transcripts certified by the court reporter. As noted above, Lee-Kendrick is correct that the original trial transcript from June 2, 2011 A.M. contained an error at Page 108, lines 19 and 20—the question and answer regarding Michael Lock. (Docket # 31-18 at 93.) The error was brought to the attention of the court reporter and was corrected in June 2012. (*Id.*)

The court of appeals rejected Lee-Kendrick's argument, finding that he failed to identify with specificity what the "correct" transcript should say and that his "self-serving and conclusory claim of error does not provide a basis for granting relief." (Docket # 31-21 at 11.) The court of appeals further found that to the extent the errors related to questions

36

about Lock, the court already determined that the mention of Lock in the record was harmless. (*Id.*)

Lee-Kendrick alleges the transcript contains errors beyond the one the court reporter corrected. The errors Lee-Kendrick alleges in the transcript are outlined in detail in Section 1.2.1 above. Although Lee-Kendrick's version seems to make sense, especially the testimony regarding his previous employment and how he obtained the house in Germantown, none of these errors are relevant to the crimes alleged. And Lee-Kendrick's version of his testimony about Lock only makes clearer his lack of association with Lock. Thus, it is unclear how Lee-Kendrick was prejudiced by trial counsel's failure to dispute the accuracy of the transcript. The areas of error regarded testimony irrelevant to Lee-Kendrick's guilt or innocence as to the sexual assaults. Lee-Kendrick has not demonstrated he is entitled to habeas relief as to this issue.

## CONCLUSION

The Wisconsin Court of Appeals rejected Lee-Kendrick's claims of ineffective assistance of both trial and postconviction counsel. Despite raising numerous alleged errors, Lee-Kendrick has failed to show the court of appeals unreasonably applied *Strickland* to the facts of Lee-Kendrick's case or unreasonably determined the facts in light of the evidence presented. Thus, Lee-Kendrick's petition for a writ of habeas corpus is denied.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant."

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 and n.4).

Although reasonable jurists could not debate that Lee-Kendrick fails to raise cognizable ineffective assistance of counsel claims for the majority of his assertions, I will grant Lee-Kendrick a certificate of appealability as to his claim of ineffective assistance of post-conviction counsel regarding trial counsel's failure to call Keeler as a witness. Given the discrepancy between the Seventh Circuit's decision in *Huusko* and its more recent unpublished decision in *London*, it is unclear whether this claim is even a cognizable ground for federal habeas relief. However, assuming that it is, reasonable jurists could debate whether the failure to call Keeler as a defense witness was prejudicial. Thus, I will grant Lee-Kendrick a certificate of appealability as to this ground, but will deny him a certificate of appealability as to the remaining grounds for relief raised. Of course, Lee-Kendrick retains the right to seek a broader certificate of appealability from the Court of Appeals pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the petitioner's petition for a writ of habeas corpus (Docket # 1) be and hereby is **DENIED**.

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**.

**IT IS ALSO ORDERED** that a certificate of appealability shall issue as to petitioner's ground of ineffective assistance of post-conviction counsel regarding trial counsel's failure to call Keeler as a witness.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 18th day December, 2020.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge

39